# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **ELEANOR W. CHADWELL,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:06CV00011 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **LEE COUNTY SCHOOL BOARD, ET AL.,** | ) | By: James P. Jones |
| | ) | Chief United States District Judge |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| **MARY RUTH LASTER**, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:06CV00012 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **LEE COUNTY SCHOOL BOARD, ET AL.,** | ) | By: James P. Jones |
| | ) | Chief United States District Judge |
| | ) | |
| Defendants. | ) | |

*Edward G. Stout, Bressler Curcio & Stout, P.C., Bristol, Virginia, and Gerald L. Gray, Gerald Gray Law Firm, Clintwood, Virginia, for Plaintiffs; Steven R. Minor and R. Lucas Hobbs, Elliott Lawson & Minor, P.C., Bristol, Virginia, for Defendants.*

These cases, consolidated for trial, involve claims under 42 U.S.C.A. § 1983 (West 2003) by two employees of the School Board of Lee County, Virginia ("the School Board") that they were demoted because of their political affiliations. After a three-day trial, a jury found in favor of the two plaintiffs and awarded them

compensatory damages for emotional harm.  One of the plaintiffs was also awarded punitive damages.  Presently before the court are the defendants' renewed motions for judgments as a matter of law or for new trials; the plaintiffs' motions for back pay and other injunctive relief; and the plaintiffs' motions for attorneys' fees and expenses pursuant to 42 U.S.C.A. § 1988(b) (West 2003).  The issues have been argued by counsel and are ripe for decision.


I


Eleanor W. Chadwell and Mary Ruth Laster filed separate actions in this court on February 13, 2006, claiming that the School Board and certain of its members—Gary Brown, John Marion, and Phil Hensley—had infringed their rights under the First and Fourteenth Amendments by demoting them on account of their political activities and membership in the Democratic Party.[1]

Chadwell first began working for the Lee County school system in 1980.  At a meeting on February 13, 2004, the School Board transferred her from her position as Director of Elementary Education to that of a reading teacher at an elementary school.  Chadwell asserted that she and her family are active Democrats and that following the November 2003 election, the School Board was controlled by

- 2 -

Republican Party members who knew of her political affiliation and transferred her based on that affiliation.[2]

Laster has been employed by the School Board in various positions in the school system since 1981. During the 2003-2004 school year, Laster was employed as the principal of Stickleyville Elementary School. At a meeting on July 26, 2004, the School Board removed Laster from that position and demoted her to a classroom teacher. Like Chadwell, Laster asserted that she and her family are active Democrats. Laster similarly alleged that the School Board was controlled by Republican Party members following the November 2003 election, and that they knew of her political affiliation and took the employment action against her because of it.

The cases were consolidated for trial. On a pretrial motion by the defendants, I held that the transfer of Chadwell by the School Board was a legislative act because her position of Director of Elementary Education had been eliminated by the School Board. *See Chadwell v. Lee County Sch. Bd.*, 457 F. Supp. 2d 690, 695 (W.D. Va. 2006). While I did not rule on the School Board's motivation in eliminating the position, I held that individual board members were thus entitled to legislative immunity. *Id.* The actions against the individual board members in Chadwell's case were dismissed, with the School Board remaining as the sole defendant.

- 3 -

The cases went to trial before a jury, and after three days of testimony, the jury returned verdicts in favor of both plaintiffs.[3] Chadwell was awarded emotional damages in the amount of $150,000. Laster was awarded emotional damages in the same amount and punitive damages against the three individual defendants each in the amount of $15,000. Following the verdict, the defendants moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) or in the alternative, as to damages, a new trial or remittitur. The plaintiffs moved for equitable relief, including reinstatement and back pay, as well as attorneys' fees and expenses.

A hearing was held on the posttrial motions on July 10, 2007. Counsel for the defendants announced that the School Board had voluntarily reinstated Laster to her former position of principal and had voted to increase Chadwell's salary to what she would have made had her position not been eliminated. The defendants did not dispute the amount of the back pay claims, $3,330 for Laster and $45,320 for Chadwell.[4] The defendants' only objection as to the amount of the attorneys' fees and expenses sought was the hourly rate claimed by Gerald L. Gray, one of the plaintiffs' attorneys. The plaintiffs conceded that the jury's award of emotional damages was excessive, and asked only that the reduction be reasonable under the circumstances.

- 4 -

The court took all of the motions under advisement, awaiting preparation of the trial transcript. That transcript has been filed and shows the following facts, viewed in the light most favorable to the prevailing parties. *See Price v. City of Charlotte*, 93 F.3d 1241, 1249-50 (4th Cir. 1996) (discussing Rule 50 motion for judgment as a matter of law).

The School Board is composed of five members. Before 1996, school board members in Lee County were appointed, but beginning with the 1996 general election, board members are elected by the voters from individual districts for four-year terms.

In accord with state law, the elections are nonpartisan, meaning only that the names of candidates appear on the ballot as a result of petitions by registered voters and not by political party nominations. *See* Va. Code Ann. § 22.1-57.3(E) (Supp. 2007).[5]

At the general election held in November 2003, the five members elected were Gary Brown, John Marion, Robert McNiel, Phil Hensley, and Homer C. "Pete" Sumpter. Marion had been elected first in 1996, but the remaining members were newly elected.[6] The board members officially took office in January 2004, and at their organizational meeting on January 8, 2004, McNiel was elected chairman. Board member Sumpter is a former chairman of the Democratic Party in Lee County.

The plaintiffs contend that other members of the newly-elected board are Republicans.[7] Gary D. McCann, a Democrat, was the Division Superintendent, the chief administrative officer of the Lee County school system. McCann was a holdover from the prior board and in May 2005 the School Board replaced him as superintendent with John Marion's brother Fred Marion, a Republican.[8]

## ELEANOR CHADWELL

At the time of the trial, Eleanor Chadwell had completed her twenty-ninth year working in the Lee County school system. She had been the administrator in the central office in charge of elementary school programs since July of 2000. At the time she assumed those duties, only one of Lee County's nine elementary schools had been accredited, and when she left the position, only one school was not accredited. Superintendent McCann credited Chadwell with being "instrumental" in this improvement. (Pls.' Ex. 9.)

Chadwell has long been active in the Democratic Party in Lee County, including serving on the county Democratic Committee. Her husband was the elected county Treasurer and a Democrat.

Chadwell had heard rumors that she was going to be transferred by the new board, and talked to Hensley and McNiel. Both of them confirmed that her transfer

- 6 -

was "being discussed." (Tr. III-15, 16.) McNiel told her that the reason was that four or five teachers had said that she "[ran] roughshod over them." (Tr. III-16.) Prior to the election, Hensley told D.J. Barker, a member of the county Board of Supervisors, that if he were elected to the School Board, there would be changes in the Central Office and "that Ms. Chadwell wouldn't be sitting up there on some fine colored leather chair." (Tr. I-4.)

At the meeting on February 13, 2004, on a motion by Hensley and seconded by Brown, the board voted four to one, with Sumpter voting against, to transfer Chadwell "from Elementary Education Director to Reading First Grant teacher at Rose Hill Elementary (grant funded, no reduction in salary; Jack Gilley to assume duties)." (Defs.' Ex. 4.) Ten other employees were transferred in the same resolution. Next, in a separate resolution by Hensley, seconded by Marion, and passed over the negative votes of Sumpter and McNiel, the board eliminated the position of Coordinator of Transportation held by Barbara Hines, a Democrat. The board later voted to hire Hines back as a school secretary after she threatened to sue the board for discharging her for political reasons.

The members of the board voting for the Chadwell resolution discussed the matter with each other prior to the meeting, but did not include member Sumpter in their discussions.[9] Superintendent McCann was advised of the proposed action only

- 7 -

a few hours prior to the meeting, and was told by chairman McNiel that he was to go along, "or else." (Tr. II-177.) Prior to the meeting, McNiel brought a typewritten list of the affected employees to McCann. Hensley joined them and Hensley had the list on a computer disc. McCann asked that one of the persons, Wayne Anderson, a mechanic foreman, be taken off the list, but he was not. Six of the transfers were the result of a student assault incident that had occurred at one of the middle schools.[10]

Before the meeting, Hensley told Robin Robbins, a friend of Chadwell's, that "I agree [that Chadwell is excellent] but there can only be one boss and she's overspent textbook funds." (Tr. II-216.)[11] Brown told Robbins prior to the meeting that while he had never heard any complaint about Chadwell, "There's something or other going on with textbook funds." (Tr. II-216-17.) After the meeting, Hensley told Robbins that Chadwell "had tons of federal violations." (Tr. II-217.) None of the board members ever mentioned Chadwell's politics to Robbins.

Chairman McNiel admitted at trial that he had told someone after the February 13 vote, "You know how politics are in Lee County." (Tr. II-98.) He contended that he had said that only to get rid of the person, and did not mean it.

One of the persons affected by the resolution on February 13 was Randi Sigmond who was transferred from her position as a middle school assistant principal as a result of the student assault incident. She had no connection with the Democratic

Case 2:06-cv-00012-JPJ-PMS   Document 131   Filed 02/04/08   Page 8 of 39   Pageid#: 1154

Party.  Following the meeting, her husband, after discussing his wife's transfer with Chairman McNiel, asked him why Chadwell had been transferred.  McNiel replied, "Politics. . . . John Marion had a grudge because the previous school board he was associated with there was three Democrats and two Republicans."  (Tr. II-224.)

Following the transfer, Hensley apologized to Chadwell on several occasions. After the present lawsuit had been filed, Hensley told her that she was "wasting her time" and that his vote was not based on politics, "but he certainly couldn't speak that same thing for John Marion and Gary Brown."  (Tr. II-10-11.)  He told her that he was becoming so frustrated with these men that "it had just about turned him into a Democrat."  (Tr. III-12.)

At trial, John Marion testified that he had assumed Chadwell was a Democrat. He claimed that she had not done a good job because she had overspent on textbooks that had not been approved by the Superintendent.  He had voted in his earlier term in office to promote her to the central office, but he agreed that it was "probably" the case that he had done so because the prior board had a Democratic majority and he simply went along.  (Tr. II-21.) Hensley testified at trial that he had no problems with Chadwell's job performance.  McNiel testified that the board had been told that Chadwell ordered books without the permission of the Superintendent.[12]

- 9 -

Chadwell denied that she had overspent on textbooks. Superintendent McCann testified that none of the board members had ever expressed concern about Chadwell's job performance or concern that she had overspent on textbooks.

The position to which Chadwell was transferred was funded by a federal grant, and there was evidence that the board was concerned about the financial situation of the school system at the time that Chadwell's position was eliminated.

The defendants showed that several known Democrats, including Mark Carter, a member of the county Board of Supervisors, Susan Chadwell, Chadwell's sister-in-law, and Wandaleen Adams, a candidate for the Democratic nomination for court clerk, were kept in administrative positions in the central office of the school system. The plaintiffs asserted that because the School Board depended upon the Board of Supervisors for some of its funding, it would be loath to target Carter. The plaintiffs also introduced evidence that Wandaleen Adams' mother was a Republican.

Chadwell testified that her transfer was humiliating and affected her sleeping, which caused her to seek counseling with a psychiatrist, who prescribed medication. She had never received counseling before, even when she had almost lost her son, and she had dealt with that circumstance better than this one.

- 10 -

## MARY RUTH LASTER

Mary Ruth Laster has worked for the Lee County school system for twenty-seven years. She started as a classroom teacher, and later served as an assistant principal and as Food Service Supervisor in the central office. She was a middle school principal for five years, but in 1996 she was transferred by a Republican-majority board to be the principal at Stickleyville Elementary School, with a reduction in salary. Until she was removed from that latter position by the defendants, she had been an administrator in the school system for twenty years.

Laster is an active Democrat, attending Party functions and campaigning for its candidates. During the 2003 election campaign for the School Board, she worked for the incumbent candidate from her district, Bill Willis, a Democrat, including putting his campaign sign in her yard and asking other people to vote for him. She did not campaign for Willis on school time or property, because she believed that would be improper.

Willis was defeated in the election by Gary Brown. Laster expected some retaliation by Brown on account of her support of his opponent. During the campaign she felt he had snubbed her when she attempted to talk with him while he was campaigning at a local community event. Brown told James Haynes that he was upset with Laster for campaigning for the "Democrat side." (Tr. III-3.)

- 11 -

At a School Board meeting on July 26, 2004, the following resolution was adopted, as the last order of business:

> Siting [sic] low SOL scores at Stickleyville, Gary Brown made a motion, seconded by Phil Hensley and passed by a vote of three ayes, one nay (Pete Sumpter) and one abstention (Bob McNiel), to transfer Mary Ruth Laster from principal at Stickleyville Elementary School to classroom teacher at Jonesville Middle School, effective July 27, 2004 and to appoint Virginia Spence as interim principal at Stickleyville and to advertise her position as assistant principal at Lee High School.

(Pls.' Ex. 1.) The item had not been on the agenda of the board meeting and Laster had no prior warning of her demotion. She learned of it only after the meeting. Other than the resolution, there was no discussion by the board members of the reasons for Laster's demotion, either in public or closed session.

Superintendent McCann testified without contradiction that the adoption of the resolution transferring Laster had required three affirmative votes.

Gary Brown denied at trial that he considered himself a Republican, although he attended the Republican Party convention in Lee County in 2003. He also put up a sign in his yard for the Republican state legislative candidate. He knew that Laster was a Democrat and was campaigning against him, and he had been told that she had circulated a nominating petition for his opponent on school time. He also heard that she had circulated a letter that he had supposedly written stating that he was going to close the Stickleyville Elementary School if elected to the School Board.

- 12 -

Brown said that in spite of what his resolution said, he had made the motion to demote Laster for "several reasons." (Tr. II-142.) He said that he understood that the state-mandated test scores—called the Standards of Learning or SOL scores—for Stickleyville for math, science, history, and English were the "lowest in the county."[13] (Tr. II-140.) He admitted that he did not know what the test scores for prior years had been or that the raw scores for Stickleyville contained the scores for disadvantaged children who attended the so-called Harvest Home. He said that he also had been concerned because the school had a project to raise money by selling candy and he had been told that students were eating some of the candy before lunch. He testified that as a school fund-raising project, kitchen cutlery was being sold and that another school principal, Rod Griffith, had told him that one of the knives had been in the possession of a Stickleyville student on a school bus. Brown believed that the student was delivering the knife to someone who had purchased it during the school sale.

Brown said he had received complaints from school bus drivers that Laster wanted all of the three school buses serving the school to arrive at the same time in the morning, and if a bus arrived early, she would not allow the students to leave the bus. Finally, Brown said that he had been told that Laster was permitting excess food to be sold from the school to persons in the community without sales tax being paid.

- 13 -

Brown had never mentioned any of these concerns to Laster nor had they ever been raised with Superintendent McCann. While candy and other snacks were sold at the school, the sales did not occur until after lunch. The children never sold or handled the cutlery and it was picked up by purchasers at the school on a day that the school was closed. Rod Griffith testified that he had no knowledge of any incident relating to a knife being found on a student on a school bus. While members of the community did purchase food from the vendor who delivered it to the school, no public funds were involved, and the customers paid the vendor directly.

As to the SOL scores, Stickleyville was fully accredited, and although the scores were down in the 2003-2004 school year, the school was in the status of Adequate Yearly Progress ("AYP") when Laster was demoted. Other schools in Lee County were not in AYP status, and their principals were not removed. The reason the Stickleyville scores were low was probably because the scores from the Harvest Home students were included in the preliminary scoring. That was not something over which Laster had any control, and the policy has since been changed to spread such scores over the county's schools. Because Stickleyville was a small school, the addition of as few as two low scores from Harvest Home could have made a difference.[14]

Board member John Marion denied at trial that he was a Republican. He said that he was a "conservative" who voted for "either party." (Tr. I-49.) While he answered an interrogatory in discovery that "I may have made a donation to a Republican, but I'm not sure" (Tr. I-50), he was forced to admit at trial when confronted with the public campaign records that he had contributed over $7,000 to such candidates in the last few years, including the Republican candidates for President, Senator, and Governor, as well as to GOPAC, a Republican campaign fund.

Marion testified that he had voted to remove Laster as principal because her school did not have a lunch room and the children ate in the gymnasium. He stated that there had been other reasons, "small things, candy sales, knife sales" (Tr. I-63) and because Brown had mentioned in his resolution that the SOL scores were low.

In fact, while it was true that Stickleyville Elementary School did not have a separate lunchroom, and was the only school in the county not to have one, Laster herself had requested the School Board for years to fund such an improvement, but without success.

Member Phil Hensley testified that he had voted to transfer Laster because she had allowed the Harvest Home test scores to be included in the Stickleyville scores. In other words, he believed that the school's scores were not low except for the

- 15 -

"school's mistake" in including the Harvest Home scores, for which Laster was responsible. (Tr. II-79, 81-82.) Hensley also said that he relied on the other matters testified to by Brown, but that "the low SOL scores were the straw that broke the camel's back." (Tr. II-91.)

Chairman McNiel abstained on the Laster vote. He admitted that he had told someone after the meeting that Brown was responsible for Laster being moved and that he may have said that Brown was out to get Laster "from the get-go." (Tr. II-101.) Brown told McNiel "something to the effect that because Ms. Laster worked so hard against him in the election that he was going to see that she was moved." (Pls.' Ex. 10.)[15]

After being demoted, Laster felt "humiliated, crushed." (Tr. 6/21/07, at 4.) While she has always had trouble sleeping, this made it worse. She dropped out of her former activities, and stopped going to church, because she felt her "world was destroyed." (*Id*. at 5.) She was not able to perform her teaching job without help because she began to doubt herself. She thinks of her demotion "every day" (*Id.* at 4) and her loss of sleep has continued until the present.

- 16 -

II

The Fourth Circuit has succinctly described the process for determining the plaintiffs' claims:

> A public employee's claim that an adverse employment decision was motivated by the exercise of the employee's First Amendment right of political affiliation is analyzed under the burden-shifting framework set forth in *Mt. Healthy* [*City School District Board of Education v. Doyle*, 429 U.S. 274 (1977)]. In order to prevail under *Mt. Healthy,* the plaintiff must first establish by a preponderance of the evidence: (1) that the plaintiff's conduct at issue was constitutionally protected, and (2) that it was a substantial or motivating factor in the employment decision. Once this burden is met, the defendant may escape liability only by proving by a preponderance of the evidence that the same employment action would have been taken absent the protected conduct.

*Cooper v. Lee County Bd. of Supervisors*, No. 98-2083, 1999 WL 631240, at *6 (4th Cir. Aug. 19, 1999) (unpublished) (citations omitted). The defendants do not dispute that the plaintiffs' political affiliation was constitutionally protected.[16] They contend rather that it was not shown by a preponderance of evidence that the plaintiffs' political affiliation was a substantial or motivating factor in the adverse employment decisions.[17]

The standards governing my consideration of the post verdict Rule 50 motion are well established. "Judgment as a matter of law is proper when, without weighing

- 17 -

the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." *Price v. City of Charlotte*, 93 F.3d at 1249 (internal quotations omitted). I am constrained by the Seventh Amendment to respect the jury's determination, and the defendants thus bear a "hefty burden" to show that the evidence was not sufficient to support the verdicts. *Id.* On the other hand, I am "not a rubber stamp convened merely to endorse the conclusions of the jury, but rather have a duty to reverse the jury verdicts if the evidence cannot support it." *Id.*at 1250.

As to plaintiff Chadwell, the defendant School Board—the only remaining defendant as to this plaintiff—argues that she failed to prove that her political affiliation was a substantial or motivating factor in the elimination of her position. I agree.

While there may be suspicion that Chadwell's transfer was politically motivated, the facts proved, even when considering all inferences from those facts in her favor, do not support the jury's verdict.

In the first place, it is clear that the board in fact eliminated the position of Director of Elementary Education, and transferred the duties of that position to another central office administrator who had no discernable political affiliation. Former Superintendent McCann testified without contradiction that other school systems do not have a separate position of Director of Elementary Education; that Lee

- 18 -

County is a "high-poverty" system; and that continuing enrollment decline and budgetary constraints were a concern of the School Board when it eliminated Chadwell's position. (Tr. II-193, 199-200.) Chadwell was transferred to a position that was federally funded, thus immediately saving the public the cost of her employment.

The board minutes of March 8, 2004, shortly after the elimination of Chadwell's position, showed that Superintendent McCann reported to the board that current enrollment in the system was 3,687, a decrease of seventy-four students since the same time the year before. (Pls.' Ex. 6.) At trial, McCann did not dispute member Hensley's report, made at the same meeting at which Chadwell's job was eliminated, that the board was committed to reductions in force of two secretaries in the central office, one speech therapist in the central office, one parts specialist at the bus shop, the Transportation Coordinator, two teachers, and one maintenance position, as well as Chadwell's position, saving $410,000 annually. (Defs.' Ex. 4.) While Chadwell asserted at trial that the board also raised some salaries, there can be no reasonable conclusion other than that the School Board did have a legitimate motivation to save money for this poor, rural school system, faced as it was with declining pupil enrollment.

Moreover, there was insufficient evidence of any improper motive. While the elimination of Chadwell's job was done early in the term of the new board, there was no house-cleaning of Democrats. In spite of the fact that the jobs of Democrats Chadwell and Hines were eliminated, other Democrats remained in the central office. Although Chadwell suggested reasons why some of these Democrats were not targeted by the new board, those reasons were speculative at best. It is more reasonable to assume that political vengeance would be visited on more than two members of the opposing party.

Finally, there was no direct evidence of political motivation. While the jury could believe that member Hensley indicated to D.J. Barker before the election that he wanted to get rid of Chadwell, no political motivation was mentioned. Chairman McNiel, who was not shown to have political leanings, was said to have indicated that John Marion's vote was political, but Marion's vote was only one out of four, even if the jury believed that McNiel had in fact made that statement. McNiel was also said to have told another person after the February 13 meeting, "You know how politics are in Lee County" (Tr. II-98), but that is a slender reed to support a finding of political motivation for the entire board.

Hensley himself denied a political motivation when talking with Chadwell after the event, although he said he could not speak for Marion and Brown. Again, that is

- 20 -

not affirmative evidence that those members were substantially motivated by political animus.

The board's decision to transfer Chadwell can certainly be viewed as mistaken or even harsh. One can even believe that politics may have played some role. Nevertheless, that is not the same as proof of substantial political motivation. In summary, in light of the circumstances of the elimination of Chadwell's position and the absence of direct evidence of a political motivation, I find that the jury verdict as to this plaintiff cannot stand.

Laster's case is different, however. There can be no doubt that it was reasonable for the jury to believe that defendant Brown instigated the removal of Laster as principal of Stickleyville Elementary School in retaliation for her active support of his opponent, a Democrat, in the election. He was quoted as threatening to do so, and the jury could reasonably believe that he was upset with her not because he understood that she was campaigning on school time, but simply because she was working for his Democratic opponent.

The defendants argue that aside from Brown, there is no evidence that the other two member of the board who voted to demote Laster cared one way or the other that she had supported their fellow board member's opponent, and thus her claim must fail.[18] I disagree.

- 21 -

In the first place, there is evidence that both Hensley and Marion, if not officially identified with the Republican Party, were allied with that cause. Marion was a large contributor to Republican candidates—a fact the jury could find that he attempted to hide—and Hensley was said to have remarked that his disagreement with the board's actions in other matters "had just about turned him into a Democrat." (Tr. III-12.)[19]

More importantly, the pretextual nature of these defendants' expressed reasons for voting for Laster's demotion shows, at the very least, that they understood the political motivation of Brown's efforts to get rid of Laster and that they acquiesced in it.

Improper motivation is usually proved by circumstantial evidence in employment cases and pretext is a powerful weapon in such proof. As the Supreme Court has held,

> In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt.

*Reeves v. Sanderson Plumbing Prods., Inc.* 530 U.S. 133, 147 (2000) (internal quotations omitted ). *See Peguero-Moronta v. Santiago*, 464 F.3d 29, 49 (1st Cir.

- 22 -

2006) (holding that "in political discrimination cases where the defendants present evidence of the non-discriminatory reasons for the adverse employment decisions at issue, the falsity of those reasons can provide circumstantial evidence that political discrimination was a substantial or motivating factor in the adverse employment decision," citing *Reeves*).

In Laster's case, it is pellucid that the reasons given by defendants were false. Not only were they demonstrated by Laster to be untrue, but the surrounding circumstances showed that they were simply after-the-fact rationalizations. Indeed, some of the reasons given bordered on the ludicrous. That a twenty-year school administrator would be fired without notice or warning because, as board member Marion testified, her school did not have the lunchroom that the board itself was obligated to provide, belies common sense.[20]

Low test scores might well be a reason to demote a principal, but the defendants could not even consistently explain that rationalization. Brown said he voted to fire Laster without warning to her because the test scores "were the lowest in the county," even though they were not and even though he did not know that the school was making Adequate Yearly Progress and was accredited, when some of the other county schools were not. Brown also explained that he did not know at the time that these preliminary scores on which he relied included the Harvest Home scores.

- 23 -

Hensley testified that he had voted to demote Laster because he <u>knew</u> that the Harvest Home scores were mistakenly included and brought down the school's scores, even though that was not her fault. Marion said that he had primarily relied on the lack-of-lunchroom reason, although he also considered the fact that Brown mentioned low SOL scores in his resolution.

Keeping in mind that the evidence showed that there was no public or closed session discussion at the time of any of these reasons, the jury was justified in believing that Brown, having bided his time for revenge, seized upon a pretext—the preliminary SOL scores—in order to get rid of Laster and that his allies Marion and Hensley went along with him.

For these reasons, the jury's verdict finding liability in Laster's case will not be set aside.


III

The defendants have moved for a new trial or remittitur as to the compensatory and punitive damages imposed in Laster's case, on the ground that they are excessive. Laster agrees that the jury's award of $150,000 compensatory damages is excessive.

- 24 -

While it is true that vague and conclusory evidence will not support an award of other than nominal damages, *see Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 547 (4th Cir. 2003), it is settled law in this circuit that a plaintiff's testimony alone can support an award of compensatory damages for emotional distress, *id.* at 546. In the most recent Fourth Circuit case on this issue, the court held that an award of $150,000 for emotional harm was justified where the plaintiff suffered distress, anxiety and frustration over a period of twenty-one months as a result of the defendant's conduct. *Sloane v. Equifax Info. Servs., LLC*, No. 06-2044, 2007 WL 4535267, at *7 (4th Cir. Dec. 27, 2007). The plaintiff's primary physical symptom was insomnia, for which she sought no professional treatment, but she also presented evidence that her emotional distress was apparent to others, and caused her and her husband to contemplate divorce. *Id.*

In Laster's case, her emotional distress was clearly justified in light of her demotion without warning for specious reasons. *See Martin v. Mecklenburg County*, 151 F. App'x 275, 282 (4th Cir. 2005) (unpublished) (upholding $100,000 award to plaintiff for emotional distress as reasonable "considering his sudden and ignominious dismissal after nearly three decades of continuous employment with the County"). In a small community like Lee County, a school principal holds a highly visible public position, and the allegations of misconduct levied against Laster, and

- 25 -

implicit in her demotion, were likely to cause her considerable humiliation and emotional pain.  Moreover, she did suffer the physical symptom of increased insomnia, and her distress continued for some time, even up to the date of trial.[21]

In summary, Laster incurred a lengthy period of emotional harm, which she adequately detailed in her trial testimony.  On the other hand, her physical symptoms were limited and she required no professional treatment.  She was able to work, although her other activities were limited by her distress.  Based on these facts, it is my determination that a compensatory damages award of $50,000 would not be excessive.[22]

The individual defendants also seek judgment in their favor as to the award of punitive damages of $15,000 each, or alternatively a remittitur or new trial as to this award.

In an action under § 1983, a plaintiff may recover punitive damages against an individual public official where the official's "conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983).[23]  The defendants argue that because Laster was not fired outright, but only demoted, and because the board members believed that she was not receiving a pay cut, there was not a sufficient showing of indifference to Laster's rights to justify punitive

- 26 -

damages.[24]  However, the circumstance here were more than a mere transfer.  It involved the demotion of a school principal, one of only a handful in the county,  to teacher status.  No reasonable board member could believe that such a demotion, for an improper reason, was simply business as usual.

Moreover, the manner in which Laster was demoted, in public, without warning or opportunity to defend herself, is sufficient proof of a sanctionable state of mind.

The defendants also contend that the amount of punitive damages is excessive. However, I find that the awards bear a reasonable relationship to the amount of compensatory damages.  *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 580 (1996). (stating that "perhaps [the] most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff").  Moreover, considering the degree of reprehensibility involved in the defendants' conduct, it is clear that the amounts awarded were not excessive.  *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (describing the factors used in assessing reprehensibility).

IV

The parties have agreed as to the amount of back pay to be awarded to Laster. Because Laster was voluntarily reinstated following the jury's verdict, and because

- 27 -

the terms of the board members have now expired, I do not find it appropriate to grant any further equitable relief.

V

Finally, Laster has filed a motion for attorneys' fees and expenses. The only objection made by the defendants is to the hourly rate of $350 claimed by Gerald L. Gray, one of the plaintiff's attorneys.

The lodestar method of calculating attorneys' fees under 18 U.S.C.A. § 1988, by which a reasonable hourly rate is first multiplied by a reasonable number of expended hours, is firmly established. The hourly rate to be used is determined by the "prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895 (1984). Accordingly, the prevailing party bears the burden of proof of "what attorneys earn from paying clients for similar services in similar circumstances." *Depaoli v. Vacation Sales Assocs., L.L.C.*, 489 F.3d 615, 622 (4th Cir. 2007) (quoting *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994)). The defendants contend that the prevailing rate in this court's Big Stone Gap Division under similar circumstances is $250, rather than $350 as requested by Mr. Gray.

- 28 -

While I fully accept Mr. Gray's representation that he regularly charges $350 per hour for his legal services, which fact is relevant although not conclusive, *see Rum Creek Coal Sales, Inc.*, 31 F.3d at 175, I find that the plaintiff has not met her burden of proving the prevailing market rate. Based on this court's examination of the established rate in other similar cases in this court, and the rate charged by Mr. Gray's co-counsel, Mr. Stout, an equally experienced employment law and civil rights attorney, I find that $250 per hour is the prevailing market rate that must be applied in this case.[25]

In determining the reasonableness of the number of hours, I will follow the factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). Fully considering those factors, and in absence of any objection, I find the fees requested reasonable, with the reduction in the hourly rate as noted for Mr. Gray.[26]

## VI

Separate final judgments will be entered in these cases in accord with the foregoing findings.

- 29 -

* * *

These cases should be a lesson to local school board members, if one is needed, of the danger of their micromanagment of personnel issues. Even aside from the claims of political motivation, it is far better for school board members, most of whom are part-time volunteers, usually ill-paid for their time spent, to concentrate on selecting a well-qualified professional superintendent in whom they have faith, and leave to that person the selection and assignment of subordinate school personnel. The evidence here, where the board spent much of its time selecting slots for individual teachers and supervisors, shows exactly the wrong way to go. Instead, a school board should utilize its time in deciding the appropriate education policy for the community and making sure that the superintendent implements that policy.

When school board members do not follow these principles, not only will education in their community likely suffer, but they will expose themselves to the liability described in this opinion.

DATED: February 4, 2008

/s/ JAMES P. JONES
Chief United States District Judge

- 30 -

1. Board members Homer C. "Pete" Sumpter and Robert McNiel were also initially named as defendants, but were voluntarily dismissed by the plaintiffs prior to trial.

2. Chadwell also alleged that following her transfer the School Board had refused to consider her for other positions in the school system based on politics, but she withdrew that claim at trial.

3. For its verdicts, the jury was asked to answer special interrogatories. In Chadwell's case the jury answered as follows:

> 1. Has plaintiff Eleanor Chadwell proved by a preponderance of the evidence that her political affiliation or activities were a substantial or motivating factor in the decision of a majority of the members of the Lee County School Board's decision to eliminate the position of Director of Elementary Education and transfer her to another position?

> <u>  X  </u>  Yes          ____  No

> 2. Has defendant Lee County School Board proved by a preponderance of the evidence that the Board would have voted to eliminate the position of Director of Elementary Education and transfer Ms. Chadwell to another position to save money or for other reasons other than her political affiliation?

> ____  Yes          <u>  X  </u>  No

In Laster's case, the jury answered as follows:

> 1. Has plaintiff Mary Ruth Laster proved by a preponderance of the evidence that her political affiliation or activities were a substantial or motivating factor in John Marion's vote to transfer her from school principal at Stickleyville Elementary to another position?

> <u>  X  </u>  Yes          ____  No

> *If your answer to Question #1 is Yes, go to Question #2. If your answer to Question #1 is No, go to Question #3.*

2.    Have the defendants proved by a preponderance of the evidence that John Marion would have voted to transfer Ms. Laster from school principal at Stickleyville Elementary to another position because of low SOL scores or for other reasons other than her political affiliation?

_____ Yes          __X__ No

3.    Has plaintiff Mary Ruth Laster proved by a preponderance of the evidence that her political affiliation or activities were a substantial or motivating factor in Gary Brown's vote to transfer her from school principal at Stickleyville Elementary to another position?

__X__ Yes          _____ No

*If your answer to Question #3 is Yes, go to Question #4.  If your answer to Question #3 is No, go to Question #5.*

4.    Have the defendants proved by a preponderance of the evidence that Gary Brown would have voted to transfer Ms. Laster from school principal at Stickleyville Elementary to another position because of low SOL scores or for other reasons other than her political affiliation?

_____ Yes          __X__ No

5.    Has plaintiff Mary Ruth Laster proved by a preponderance of the evidence that her political affiliation or activities were a substantial or motivating factor in Phil Hensley's vote to transfer her from school principal at Stickleyville Elementary to another position?

__X__ Yes          _____ No

*If your answer to Question #5 is Yes, go to Question #6.  If your answer to Qustion #5 is No, you are finished.  Have the foreperson sign the verdict form.*

- 32 -

6.      Have the defendants proved by a preponderance of the evidence that Phil Hensley would have voted to transfer Ms. Laster from school principal at Stickleyville Elementary to another position because of low SOL scores or for other reasons other than her political affiliation?

_____ Yes            X    No

4.  The parties stipulated at trial the difference between what the plaintiffs received in salary for the school years 2004-2005, 2005-2006, and 2006-2007, and what they would have received for those years had they not been demoted.

5.  In Virginia, only the ballots for state or national offices contain identification of the candidates' political party.  Even for local offices for which political party nominations may be made, the candidates' political affiliation does not appear.  *See* Va. Code Ann. § 24.2-613 (2006).  Thus, the evidence showed that the Lee County political parties each nominated candidates for local offices by party conventions, but, like the school board candidates, those candidates' party affiliations did not appear on the ballot.

6.  Sumpter had served on the School Board in the past, before board members were elected.

7.  The political affiliation of the defendants (and other individuals) was a matter of considerable dispute at trial.  In Virginia, voters do not register by political party.  *See Miller v. Cunningham*, Nos. 06-2334, 07-1002, 2007 WL 4555761, at *9 (4th Cir. Dec. 20, 2007) (Wilkinson, J., dissenting).  No witnesses were asked about their actual votes, which even if asked, would likely have been objectionable.  *See* Paul F. Rothstein & Susan W. Crump, *Federal Testimonial Privileges* § 10:6 (2d ed. 1996) (recognizing common law privilege to refuse to disclose vote at secret ballot election, based on duty of government to protect the free exercise of right to vote).

8.  The local school board appoints the division superintendent.  *See* Va. Code Ann. § 22.1-60(A) (2006).  McNiel resigned from the board because of Fred Marion's appointment and thus was not a member of the board at the time of trial.

9.  Relations between Sumpter and the rest of the board were strained.  Sumpter had been criticized for his involvement in a bid on a school building project, which the other members felt was a conflict of interest.  The month before the February 13 meeting, Hensley sent an e-mail to McNiel, complaining that "I believe more and more that Mr. McCain [McCann] is working with pete [Sumpter] and against the rest of us.  And I do not like that." (Pls.' Ex. 7.)  Hensley explained that this e-mail was about the conflict of interest issue.  The other board members also accused Sumpter of tape recording non-public sessions of the board.

- 33 -

10. Hensley claimed at trial that at this time McNiel asked Superintendent McCann, "Is there anything we can do?" and McCann replied, "Do something with Eleanor [Chadwell]." (Tr. II-60.) McNiel corroborated this conversation, but McCann denied that he had ever made such a statement.

11. Hensley testified at trial that he did not remember making this statement, but that it was true that McCann and Chadwell were both candidates for the superintendent's job that McCann received under the prior board, and thus McCann turned out to be the "boss." (Tr. II-76.)

12. Because they were acting in a legislative capacity in abolishing Chadwell's position, the individual board members enjoyed a testimonial privilege not to disclose their reasons for voting as they did. *See Burtnick v. McLean*, 76 F.3d 611, 613 (4th Cir. 1996). The board members were thus not asked directly why they voted as they did on the Chadwell resolution. No such privilege existed in Laster's case.

13. The Virginia Standards of Learning were revised in 1995 by the State Board of Education to set forth learning and achievement expectations for K-12 students in certain core subjects. Standardized tests were then developed to link these standards to school accountability and accreditation. In 1998, the first year of SOL testing, only two percent of Virginia schools met the criteria for full accreditation, but by 2004, eighty-four percent did. Such accountability testing has been required as a condition of federal funding since the adoption of the No Child Left Behind Act of 2001. *See* Wikipedia, *Standards of Learning*, http://www.wikipedia.org/wiki/Standards of Learning (last visited Feb. 1, 2008).

14. Contrary to Brown's statement, the July preliminary SOL scores for Lee County showed that Stickleyville was not the lowest in each subject for each grade tested, although it was for some grades in some subjects and was near the bottom in the others. (Defs.' Ex. 9.)

15. McNiel so testified in his deposition. He later said that while this was accurate, it was incomplete in that Brown had said that he was upset because "she had worked against him on school time." (Tr. II-111.)

16. While the defendants presented evidence that Laster had violated a rule by having certain political material photocopied at her school during the 2003 election, it was not contended that this violation was relied upon for her demotion, or was even known by the members of the School Board when they demoted her.

17. The jury in this case was instructed without objection as to the elements of the plaintiffs' claims, as follows:

> The plaintiffs claim that they expressed political opinions

- 34 -

or engaged in political activities and associations as are protected by the First Amendment to the United States Constitution. Ms. Chadwell claims that after engaging in protected First Amendment conduct, the Lee County School Board eliminated her position of Director of Elementary Education and transferred her to another position. Ms. Laster alleges that after engaging in protected First Amendment conduct, the School Board transferred her from school principal at Stickleyville Elementary School to another position.

The defendants deny that they were motivated by political considerations in their decisions concerning the plaintiffs or that they violated the plaintiffs' constitutional rights.

The plaintiffs have the right under the First Amendment to engage in political activities, political associations, and to express political opinions. In order for a plaintiff to prevail on her claim, you must find that the plaintiff's protected First Amendment conduct, that is, the expression of political opinion, participation in political associations, or engaging in political activities, was a substantial or motivating factor to a majority of the School Board in the adverse employment decision.

The plaintiff is not required to produce direct evidence of unlawful motive, intent, or design. A motive, intent, or design to violate a person's constitutional rights, if it exists, may be shown from circumstantial evidence.

To prove that political affiliation or activities was a substantial or motivating factor in the decision, a plaintiff does not have to prove that was the only reason the decision was made. The plaintiff need only prove that her political affiliation or activities was a substantial consideration that made a difference in or influenced the decision.

While Ms. Chadwell's and Ms. Laster's cases are being tried together, you must consider each case, and the evidence relating thereto, separately. Because you find one way in one of the cases does not mean that you must find the same way in the other case.

- 35 -

In order to find majority action by the Board, you must agree as to the identity of the members of the Board constituting that majority.

If you find that Ms. Chadwell has shown by the greater weight of the evidence that her protected First Amendment conduct was a substantial or motivating factor to a majority of the School Board in the decision to eliminate the position of Director of Elementary Education, then you must next determine whether the School Board has shown by the greater weight of the evidence that the School Board would have eliminated the position even if Ms. Chadwell's political activities, associations, and expression of opinion had not been considered, to save money or for other reasons. If the School Board shows, by a preponderance of the evidence, that Ms. Chadwell's position would have been eliminated and she would have been transferred in any event for other reasons, then you should find for the defendant School Board.

In Ms. Laster's case, if you find that Ms. Laster has shown by the greater weight of the evidence that her protected First Amendment conduct, was a substantial or motivating factor to a majority of the School Board in the decision to transfer her, then you must next determine whether the defendants have shown by a preponderance of the evidence that the School Board would have voted to transfer her, even if her political activities, associations, and expressions of opinion had not been considered, because of low SOL scores or for other reasons. If the defendants show, by a preponderance of the evidence, that Ms. Laster would have been transferred for other reasons, then you should find for the defendants.

In considering the actions of the School Board or its members, you should not substitute your judgment for that of the defendants. In other words, you may not return a verdict for either plaintiff just because you might disagree with the School Board's decisions or believe the decisions to be incorrect, harsh or unreasonable.

The fact that the plaintiffs Ms. Chadwell and Ms. Laster

are Democrats is not, in and of itself, evidence of
discrimination. Nor is it enough for the plaintiffs to simply
show that the defendant members of the school board are
Republicans or that politics is important to them.

(Instructions Nos. 7, 8, & 9.)

18. Even if this argument were valid, and only Brown's vote was improperly motivated, the
School Board itself would still be liable, since the evidence showed that it took three
affirmative votes to demote Laster, with Brown supplying the necessary third vote.

19. The defendants argue that this remark simply meant that "he was not a Democrat."
(Defs.' Mem. Supp. Renewed Mot. for J. 6.) However, under the circumstances of the
politically-charged nature of Lee County civic life, the jury could reasonably find that it
meant that he was switching his allegiance from one party to the other.

20. Indeed, as is often the case, the cold record does not adequately portray the difficulty
John Marion had in giving straight answers to the questions asked of him at trial, an
impression the jury most certainly took into account in judging his credibility.

21. While Laster was her only witness as to her emotional harm, the defendants declined to
cross examine her as to this issue, and offered no evidence contrary to her testimony.

22. While the formal procedure is to grant a new trial unless the plaintiff accepts a remittitur
of the jury award, the plaintiffs here have stated that they would accept a remittitur in lieu
of a new trial and thus it is not necessary to follow the usual procedure. Had I not
determined to grant judgment for the School Board on Chadwell's claim, I would have also
reduced her damage award to $50,000. Chadwell did receive some unspecified psychiatric
treatment, but otherwise her circumstances were essentially the same as Laster's, except that
she did receive some notice that she might be transferred. *See* Fed. R. Civ. P. 50(c)(1)
(requiring district court when granting motion for judgment as a matter of law to also
conditionally rule on motion for new trial).

23. The jury was instructed without objection as to punitive damages as follows:

> In Ms. Laster's case, punitive damages may be awarded, in your
> discretion, to punish an individual defendant, and to deter that
> defendant and others like him from committing similar conduct
> in the future. You may not award punitive damages against the
> School Board.

- 37 -

You may award Ms. Laster punitive damages only if you find that an individual defendant's actions were done wantonly. An act is wantonly done if it is done in reckless or callous disregard of, or with indifference to, the rights of the injured person. Ms. Laster has the burden of proving, by a preponderance of the evidence, that a defendant acted wantonly with regard to her rights.

In this case there are multiple defendants. You must make a separate determination whether each defendant acted wantonly.

An award of punitive damages is entirely discretionary. That is, even if the legal requirements for punitive damages are satisfied, you may still decide not to award them. In making this decision, you should consider the underlying purpose of punitive damages. They are awarded to punish a defendant for outrageous conduct and to deter the defendant and others from engaging in similar conduct in the future. Thus, in deciding whether to award punitive damages, you should consider whether, on the one hand, the defendant may be adequately punished by an award of actual damages, or whether, on the other hand, the defendant's conduct was so extreme and outrageous that actual damages are inadequate to punish the wrongful conduct, and to deter the defendant and others from engaging in this type of conduct.

If you decide to award punitive damages against a particular defendant, you must use sound reason in setting the amount; it must not reflect bias, prejudice, or sympathy toward any party. The amount should be no larger or smaller than the amount necessary to fulfill the purposes of punitive damages. You must consider the degree of reprehensibility of the defendant's conduct, and the relationship between the amount of punitive damages to the actual harm inflicted on Ms. Laster. You may also consider the financial resources of the defendant in fixing the amount of punitive damages. You may impose punitive damages against one or more of the defendants and not others, or against more than one defendant in different amounts.

- 38 -

You are not to punish a defendant and award punitive damages for harm caused by that defendant's alleged misconduct to any other persons, such as Eleanor Chadwell, Randi Sigmond, Barbara Hines or anyone else you heard about in this case.

(Instructions Nos. 5 & 6.)

24.  In fact, of course, the parties stipulated at trial that Laster was paid $3,330 less than she would have earned as a school principal.

25.  In doing so, I certainly do not deprecate Mr. Gray's ability and reputation as an attorney.

26.  I have also added two hours to each attorney's request to cover the post-verdict motions hearing, which was not included in their hourly fee itemizations.  A small portion of Mr. Gray's itemization was for an associate billed at a lesser rate.  Considering these items, I find that Mr. Stout is entitled to a fee in Laster's case of $50,375 plus expenses of $3,973.90, and Mr. Gray is entitled to a fee of $31,095, for a total of $85,443.90.